**In the Matter of BALDWIN–UNITED CORPORATION, D.H. Baldwin Company, Debtors, Consolidated Appeals of the Unsecured Creditors' Committees of Both Debtors.**

**Civ. A. No. C–1–84–345.**

United States District Court,
S.D. Ohio, W.D.

Aug. 31, 1984.

Paul B. O'Kelly, John Richards Lee, Gregory P. von Schaumburg, U.S.S.E.C., Chicago, Ill., for S.E.C.

Robert J. White, Linda J. Smith, O'Melveny & Myers, Los Angeles, Cal., Don R. Gardner, Genina C. Bowman, Keating, Muething & Klekamp, Cincinnati, Ohio, for debtors-in possession.

Joseph Patchan, Susan B. Collins, Baker & Hostetler, Cleveland, Ohio, Leon S. Forman, Thomas E. Biron, Wexler, Weisman, Forman & Shapiro, Philadelphia, Pa., for Unsecured Creditors' Committees.

## OPINION AND ORDER

DAVID S. PORTER, Senior District Judge:

### I. *Introduction*

The issue in these consolidated appeals from four orders of the United States Bankruptcy Court for the Southern District of Ohio boils down to whether or not the bankruptcy court has the discretion to permit a Chapter 11 debtor to advance its present and former non-management directors' funds from the estate with which to pay for their defense, as individual defendants, in securities actions alleging misconduct during their terms as directors. We conclude, for reasons which follow, that while the bankruptcy court may in a proper case order such disbursements, conditioned upon appropriate findings, on behalf of present directors of the debtors, the Bankruptcy Code does not give the bankruptcy court the power to authorize such payments on behalf of former directors of the debtors. We therefore reverse the orders appealed from and remand for further consideration below as to the present directors.

### A. *Parties*

Debtors here are Baldwin-United Corporation and D.H. Baldwin Company. Their reorganization petitions were filed under Chapter 11 of the Bankruptcy Act, 11 U.S.C. §§ 1101 *et seq.*, in September, 1983.

Appellants are the Unsecured Creditors' Committee of each debtor.

*Amicus curiae* briefs were received from the Securities and Exchange Commission and Jones, Day, Reavis & Pogue, a law firm which has been retained to defend 10 present and three former directors in various securities and other actions pending in this Court and in the United States Bankruptcy Court for the Northern District of Texas. The SEC's brief was requested by the Court, and Jones, Day's was filed with leave as an alternative to their petition to intervene.

### B. *Facts*

About a dozen of debtors' present and former directors and officers are defendants in at least three civil suits pending in this and other courts. Included among the pending actions are *Hilda Stoller, et al. v. Baldwin-United Corporation, et al.,* Civil Action No. C–1–82–1438 (S.D.Ohio, filed December 8, 1982);[1] *Ralph Bedel, Trustee, Quality Scale Company Employee Profit Sharing Plan, etc. v. Morley Thompson, et al.,* Civil Action No. C–1–83–1990 (S.D. Ohio, filed December 13, 1983); and *James B. Van Treese v. Baldwin-United Corporation,* Adversary Proceeding No. 383–1054 (Bankr.N.D.Texas, filed October 10, 1983).

The *Stoller* and *Quality Scale* cases allege violations of the Securities Acts, and *Van Treese* asserts tortious interference with professional relationships or equivalent acts by defendants therein.

### C.

This controversy arises from the debtors' efforts, through their current boards of directors, to give effect to a provision in

---

**1.** The *Stoller* case, in reality several consolidated cases asserting the same cause of action, i.e. market fraud stemming from Baldwin's acquisition of a large mortgage insurance firm, was stayed by order of this Court until December 31, 1984. *Stoller v. Baldwin-United,* 41 B.R. 884, partially reported at 125 Bankr.L.Rep. (CCH) ¶ 69, 850 (S.D.Ohio 1984).

the corporate bylaws of both debtors which provides as follows:

> 6.1 The Company may indemnify or agree to indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, other than an action by or in the right of the Company, by reason of the fact that he is or was a director, officer, employee, or agent of the Company ... including attorneys' fees, judgments, fines, and amounts paid in settlement ... if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company .... The termination of any action ... by judgment, order, [or] settlement ... shall not ... create a presumption that the person did not act in good faith ....

Brief of Appellees at Appendices C, D. Pursuant to the terms of the indemnification provisions, the boards have voted to advance monies for the legal fees of their present and former directors and, with the exception of Morley Thompson, past presi-dent of the debtors, officers in the *Stoller*, *Quality Scale* and *Van Treese* cases.[2]

After the debtors' boards approved the indemnification proposals, debtors approached the bankruptcy court with motions seeking to retain counsel to represent various individuals and groups who do or did serve on the debtors' boards. After wrestling with the issue for some time, the bankruptcy court, in a series of orders in January, February, and March, 1984, granted the motions to retain counsel. The bankruptcy court's rationale, although never articulated at length, was made clear by a statement from the bench at an October, 1983 status conference:

> it appears to me that the debtor continuing to pay for that representation is amply justified .... I don't think it's fair to require the directors to go out and borrow hundreds of thousands of dollars for their own defense and only have it paid back under certain circumstances.
>
> That would appear to be as much of a chilling effect upon being a director as almost anything I can think of.

App. 517–18.[3]

These appeals followed.[4] The proceedings below, although procedurally tedious,

---

2. Appellants initially raised objections as to the procedure used by the debtors' boards in determining to indemnify their members and alumni, primarily because the matter was put to a vote before certain of the undertakings to repay the debtors in the event that indemnification was later determined to be inappropriate had not been executed at the time of the votes. However, at hearing, counsel for the appellants agreed that because the undertakings had since been executed, whatever procedural shortcomings attached to the boards' actions had been cured.

3. The bankruptcy court also opined, in the last of the orders appealed from, that:

> Because of the potential harm to the debtors which may arise if former officers and directors are not provided legal representation, and the significant problems which may occur if the present officers and directors are not assured that their legal expenses will be paid by the debtors if suit is brought against them, this Court reaffirms its conviction that the debtors should be permitted to assume the prepetition commitment to pay the legal expenses of its former officers and directors.

A. 413–14.

4. The orders of the bankruptcy court pertaining to which notices of appeal to this Court were filed are as follows:

—An order filed on January 31, 1984 (doc. 38), authorizing the debtors to retain Bauer, Morelli & Heyd Co., L.P.A. to represent James E. Carpenter, a former officer of debtors and certain of their subsidiaries, in the *Stoller* litigation. The Committees appealed that order to this Court on February 9, 1984 (docs. 40, 44).

—An order filed on February 3, 1984 (doc. 39), authorizing Baldwin-United to retain Jones, Day, Reavis & Pogue to represent 7 present and 3 former directors in the *Stoller* litigation, and to represent one former director in the *Van Treese* litigation. The Committees also appealed that order on February 9, 1984 (docs. 42, 46).

—An order filed on February 10, 1984, as part of Status Conference Order No. 4 (doc. 48) finalizing a December 5, 1983 order authorizing the debtors to retain Greenebaum, Doll & McDonald to represent James E. Schwab, a former officer of debtors, in the *Stoller* litigation (*see* docs. 24, 27). The Committees appealed the February 10 order on February 13, 1984 (docs. 55, 57).

—An order filed on March 1, 1984 (doc. 70) authorizing the debtors to retain Graydon, Head

were relatively simple: the debtors moved to have their present and former directors be indemnified, and the bankruptcy court granted the motions. Unfortunately, the matter turns out to be a good deal more complicated than first appears, involving as it does matters of apparent first impression as to interpretation of the Bankruptcy Code.

D.

Indemnification of corporate directors for their legal expenses in defending suits challenging their activities while serving the corporation is a concept which has gained a great deal of support in recent years. As the debtors point out, 41 states presently have statutory provisions permitting incorporation of prejudgment indemnification provisions into corporate bylaws. These include Delaware and Ohio, the two states whose law is arguably relevant here. The authorities and references cited by the debtors leave little doubt, and appellants do not seriously dispute, that important public policy considerations militate in favor of such provisions. As noted in *Wisener v. Air Express International Corp.*, 583 F.2d 579, 583 (2d Cir.1978) (footnote omitted),

> a legislative judgment has been made that such protection is necessary or desirable to encourage recruitment of capable management, and that corporate assumption of officers' liabilities for the costs of defense of suits based on decisions and actions, taken in the corporate interest, should properly be permitted and indeed required when the litigation has terminated successfully for the officer.

The Securities and Exchange Commission, in its role as *amicus* herein, takes a similar position, noting in its brief that it

> believes that outside directors should be encouraged to serve on the boards of directors of publicly-held corporations.

In the Commission's view, outside directors provide important protections for public investors in corporations generally and particularly where companies are financially troubled. Indemnification for costs incurred in the defense of the good faith exercise of their business judgment is an appropriate and necessary expense in order to attract qualified persons to serve in that capacity.

Brief of the Securities and Exchange Commission at 2–3.

Juxtaposed against these tenets of corporation policy is the "policy mandated by the bankruptcy laws of equality of distribution among the various members of each class of creditors." *Id.* at 3. As one court has noted in a similar context, "[t]his question presents ... a conflict between basic principles of corporations law and the Bankruptcy [Code], the former leading all too often to the latter." *In re THC Financial Corp.*, 446 F.Supp. 1329 (D.Hawaii 1977).

We observe these competing policy considerations early in this opinion because we find them, while certainly relevant to our consideration of the issues herein, not dispositive. Because our decision is based upon established principles of bankruptcy law, it has proven unnecessary to explore at length the appropriate balance between the corporate and bankruptcy policy factors just noted. We do believe, however, that were such a balancing essential, the federal policy of equality of distribution of assets among similarly situated creditors would outweigh the policies supporting indemnification of corporate directors once a corporation has become a Chapter 11 debtor.

## II. *Timeliness*

Jones, Day, Reavis & Pogue, appearing as *amicus curiae*, asserts that at least as to the order authorizing their retention as

& Ritchey to represent Robert S. Harrison, a former officer and director of Baldwin-United and a former officer of D.H. Baldwin, in the *Stoller* and *Quality Scale* litigation, and authorizing the debtors to retain Greenebaum, Doll & McDonald to represent James E. Schwab, a former director of debtors, in the *Quality Scale*

litigation. The bankruptcy court certified the March 1, 1984 order to this Court, and the Committees also appealed on March 8, 1984 (docs. 74, 75).

On March 15, 1984, the parties stipulated to the consolidation of the eight appeals pending before this Court (doc. 87).

counsel for ten individuals, this appeal is untimely. While we have reservations regarding their standing, as *amicus*, to argue a potentially dispositive issue not raised by the appellees in defense of their position, we do not address that concern because we resolve the timeliness issue in favor of the appellants.

The essence of Jones, Day's argument is that the bankruptcy court had, as early as October 17 and 21, 1984, and November 13, 1983, decided by means of appealable orders that it would authorize the debtors to advance fees to represent the individual defendants in the various pieces of litigation then pending. While the bankruptcy court indeed took steps in late 1983 which lend support to Jones, Day's position, examining the situation in context leads us to the conclusion that the appeals here are timely. We summarize the bankruptcy court's actions as follows.

Immediately after filing their reorganization petitions, debtors petitioned the bankruptcy court for leave to continue in effect their retention of the law firm of Debevoise & Plimpton to represent its general interest in the bankruptcy, as well as to represent the individual *Stoller* defendants (docs. 4, 7).

On October 3, 1983, the bankruptcy court entered an order (doc. 11) which provided as follows:

> In the Court's view, the approval of the applications [for Debevoise & Plimpton] to represent the nonmanagement directors [in the *Stoller* case] hinges on the resolution of two issues:
>
> 1. Does a conflict of interest exist between the nonmanagement directors and the debtors such as to preclude the representation of both by the same law firm?
>
> 2. Assuming that the answer to the above-stated issue is in the negative, should the debtors in possession be required (or permitted) to bear the expense of such representation?
>
> The debtors and all parties in interest should be prepared to address the above-stated issues at a hearing to be held on October 17, 1983 ....

*Id.* at 1–2.

As a result of the October 17 hearing, the court entered an order (doc. 15) referring to the debtors' application to retain Debevoise to represent their nonmanagement directors, which provided that

> [the motions] are provisionally granted effective October 17, 1983. However, parties in interest shall have until October 27, 1983 to file objections and Debevoise & Plimpton until November 3, 1983 to respond thereto to that application which seeks the appointment of Debevoise & Plimpton to represent nonmanagement directors in the class action [*Stoller*] litigation. Thereafter, the Court reserves the right to reconsider that aspect of its rulings. A final ruling will be made with respect to this application on or after November 11, 1983. In any event, debtors are hereby authorized to pay for the legal representation of non-management directors.

*Id.* at 7.

The matter was then briefed, with briefing concentrating primarily on the conflict of interest issue but at least peripherally addressing the propriety of Debevoise's representation of the directors in the first instance (docs. 16–20). On November 11, 1983, the bankruptcy court issued an order devoted in its entirety to discussion of the conflict issue, and concluding that "the applications for orders authorizing employment of Debevoise & Plimpton are DENIED insofar as they seek authority to hire such firm to represent the nonmanagement directors in *Stoller* .... (Doc. 23 at 4.)

On the same day, debtors filed a motion to have Greenebaum, Doll & McDonald represent James E. Schwab in the *Stoller* case (doc. 21). That motion was granted, apparently *ex parte*, with ten days' leave to object thereto (doc. 24). A creditor did in fact object (doc. 26), and the court amended the authorization order to give "any party in interest ... until January 12, 1984 to object" to the order (doc. 27). On Decem-

ber 19, 1983, the debtors filed their request to retain Jones, Day to represent the individuals noted above.

In order to fully flesh out the parameters of the timeliness argument, it is necessary to note two statements made by the bankruptcy court in status conferences.

The first such statement appears in the transcript of an October 11, 1983 status conference:

THE COURT: Before we go further, ladies and gentlemen, there is something I forgot to mention. With regard to the question as to Debevoise & Plimpton, another issue that was raised in the order, my order of October the 3rd, was whether or not the debtor (sic) should pay for the representation as to the non-management directors.

I have reviewed the indemnification provisions of the bylaws, and I have also reviewed some of the statutory law on the question, as well as the THC case, I believe, which was attached.

And it appears to me that the debtor continuing to pay for that representation is amply justified, although THC did not exactly come out that way. I don't think its' fair to require the directors to go out and borrow hundreds of thousands of dollars for their own defense and only have it paid back under certain circumstances.

That would appear to be as much of a chilling effect upon being a director as almost anything I can think of.

Accordingly, I will—I will grant the application to have the debtor (sic) pay for the representation of nonmanagement directors, and even Mr. Mesh [coun-

sel for the *Stoller* plaintiffs] agreed with that point.

App. 517–18.

At the next conference, held on November 11, 1983, counsel for a creditor raised the matter of "whether the Debtors ... are obligated to assume" the defense of the nonmanagement directors in *Stoller* and other cases. The bankruptcy court responded as follows:

THE COURT: Ms. Collins, you are a month late on that. Last month we decided that. It was decided that based upon my review of the bylaws—and I will admit that I had some preservations (sic) about it as well, but based upon the state law of Delaware and the cases that were cited, I believe that while it was somewhat unusual, that it was only fair and reasonable, as well as to the Debtors' benefit, that those expenses be paid pursuant to the conditions set forth in the bylaws and the state law of Delaware, and I believe we disposed of that matter at the last conference. As far as I'm concerned, that's been ruled on.

App. 313.

It is these orders and statements, then, upon which Jones, Day rests its argument.

■ We assume for present purposes that our jurisdiction over these appeals comes from 28 U.S.C. § 1334 and Bankruptcy Rule 8001.[5] We further conclude that while we may or may not have the authority to certify for appeal to this Court interlocutory rulings of the bankruptcy court, appellants are obliged to appeal only final orders of the bankruptcy court to this Court; that is, we conclude that a party's failure to seek leave to appeal an interlocutory ruling below does not waive its right to appeal the resultant "final" order.[6]

---

**5.** We do not attempt to determine which of the 1948, 1978, or 1984 versions of 28 U.S.C. § 1334 (62 Stat. 931 (1948), Pub.L. No. 95–598, Title IV, § 402(b) (November 6, 1978); Bankruptcy Amendments and Federal Judgeship Act of 1984, Title I, § 101(a) (July 10, 1984)) apply herein, nor do we consider the ramifications of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) on this case, since there appears to be no dispute that we are empowered

to review the orders of the bankruptcy court herein and we are satisfied that we do in fact have jurisdiction.

**6.** Of course, the actual "final order" in a reorganization proceeding is the order of the bankruptcy court approving the plan of reorganization. However, proceedings such as these are inevitably drawn out over a period of months or, as is likely in this case, years; were the "final order" requirement given full effect in such cases, then orders such as these, permitting

■ Those parameters established, then, we turn to the question whether or not the October or November, or both, statements by the bankruptcy court and its concommitant orders were "final orders" such that appeals should have been filed therefrom instead of from the later orders authorizing retention of specific law firms to represent the debtors' directors' interests. We first note that

[a] final judgment is one which disposes of the whole subject, gives all the relief that was contemplated, provides with reasonable completeness, for giving effect to the judgment and leaves nothing to be done in the cause save superintend, ministerially, the execution of the decree.

*City of Louisa v. Levi*, 140 F.2d 512, 514 (6th Cir.1944); *see also Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) (a final judgment "ends the litigation ... and leaves nothing for the court to do but execute the judgment").

As Collier notes, "[t]he determination of whether an order is final or interlocutory is often a difficult one to make." 1 L. King, *et al.*, eds., *Collier on Bankruptcy* ¶ 3.03[d][iii] (1984). However, under either of the tests just described, it is clear that the October and November orders were not final even as to this particular aspect of the reorganizations. The October 17, 1983 order, which appeared in a lengthy status conference order, said only that "debtors are hereby authorized to pay for the legal representation of nonmanagement directors" (doc. 15 at 7); the November 11, 1983 order denied debtors' motion to retain Debevoise & Plimpton (doc. 23 at 4); the October status conference comment was that the court "will grant" the motion, thus being in the future tense; and while the November status conference comment indicated that the matter had, in the view of

the bankruptcy court, been ruled upon, it is clear from the context there that the parties were far from than certain as to the fact of ruling, and the court's own uncertainty as to the finality of the matter is indicated by the fact that the December 5, 1983 order authorizing retention of Greenebaum, Doll & McDonald gave the parties until January 12, 1984 to prepare their objections.

Even were these various occurrences, statements, and orders less ambiguous to those involved than they appear to us to be, it was not until the court had determined that specific law firms would be retained to represent the various individuals here involved that the court had given "all the relief that was contemplated ... leaving nothing to be done in the cause save superintend, ministerially, the execution of the decree." *City of Louisa*, 140 F.2d at 514.[7]

We therefore find that the appeals were timely filed from the various orders of the bankruptcy court authorizing retention of specific law firms. While we have considered the possibility that the orders may in fact have been interlocutory, thus requiring the appellants to seek leave of this Court to proceed with their appeals, we do not pursue the matter because the bankruptcy court, recognizing that the issue is significant and likely to recur, certified the Graydon, Head & Ritchey and Greenbaum, Doll & McDonald order to this Court pursuant to §§ (e)(2)(A)(ii), (e)(3) of this Court's December 23, 1982 Order establishing procedures for operation of the bankruptcy system. In light of the certification, and the fact that the parties have agreed that all of these appeals are consolidated with the certified order, we address the merits.

### III. *The Former Directors*

Neither the orders nor the recorded statements of the bankruptcy court distin-

---

*ad interim* disbursement of funds belonging to the estate, and thus to the creditors, would be effectively mooted by requiring that appeal as of right not lie until a plan has been approved.

**7.** Anticipating the argument that selection of a particular law firm was a ministerial act carrying out the court's prior "final" determination

that retention of counsel was lawful, we note our impression that such orders in fact are classically interlocutory; that is it "requires further steps to be taken in order to enable the court to adjudicate the cause on the merits." 1 *Collier on Bankruptcy* ¶ 3.03[d][iii] at 3–301.

guish between the present and former directors and officers of the debtors. This is, however, a distinction which we find to be essential to resolution of the issues presented, as recognized by the parties in their briefs. We first consider the decision to permit advancement of fees on behalf of the former directors.

### A. *Summary of Arguments*

Although we have been unable to conclude from the record below the precise legal basis for the bankruptcy court's determination that the fees for former directors and officers would be advanced by the estate, debtors' brief suggests only one rationale for that conclusion. They assert that, under Section 503 of the Bankruptcy Code, 11 U.S.C. 503(b)(1)(A), the bankruptcy court had discretion to find that such advances would benefit the estate, and so to afford the expenses administrative priority. Were that so, our task would be limited to determining whether such discretion was abused.

The Committees, joined by the SEC, argue that § 503 does not give the bankruptcy court authority to authorize such expenditures from the estates for the benefit of former directors.

### B.

Section 503(b)(1)(A) (1978) provides as follows:

.(b) After notice and a hearing, there shall be allowed, administrative expenses . . . including—

8. The Bankruptcy and Federal Judgeship Act of 1984, Title III, § 446(1) (July 10, 1984) amended § 503(b) by deleting the comma following the words "be allowed."

9. In their papers in the bankruptcy court, debtors took the position that the court had authority to allow retention of counsel to represent the former directors under 11 U.S.C. § 105(a). That section provides that the bankruptcy court "may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." Affirmance under § 105 is not urged on appeal, so we do not consider it at length. We do make one observation. By its language, section 105(a) applies only where there are "provisions of" the Bankruptcy Code to be carried out

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.] [8]

There are two threshold observations. The first is that the second clause of § 503(b)(1)(A) is clearly inapplicable; the expenditures authorized must, to be lawful under § 503, be actual and necessary costs of preserving the estates for the benefit of their creditors. The second is that the record below does not demonstrate either that the debtors proceeded on an administrative priority theory,[9] or that the bankruptcy court based its ruling on Section 503.[10] We are therefore faced with a clear slate in evaluating this issue.

### C. *Background–§ 503(b)(1)(A)*

 The cases are clear as to several principles regarding the proper interpretation of Section 503. The first is that the "actual" and "necessary" provisions of the statute "must be narrowly construed, in order to keep fees and administrative expenses at a minimum so as to preserve the estate for the benefit of all creditors." *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982). As noted by the Bankruptcy Panel of the Ninth Circuit,

The significance of an allowance pursuant to section 503(b)(1) is two-fold: it is not only an allowance against the estate; administrative claims enjoy a priority over other claims. Priority statutes are strictly construed.

through its application. It is clear, then, that where no section of the Code can be shown to be "carr[ied] out" by an order under § 105, the bankruptcy court may not improvise to overcome the statutes.

10. In fact, the clearest statement of reasoning by the bankruptcy court indicates that its ruling was based upon the "chilling effect upon being a director" (App. 518) which would, in the court's estimation, occur were such expenses borne by the former directors themselves. Thus it appears that the court's focus was not on the potential for benefit to the estate, which we perceive as the central (if not the only) goal of § 503(b)(1)(A), but rather on corporate policy matters.

**452**

*In re Club Development & Management Corporation,* 27 B.R. 610, 612 (Bankr.App. 9th Cir.1982).

This construction makes perfect sense in light of the objective of reorganization proceedings. As noted by Judge Coffin in a case arising under the Bankruptcy Act,[11]

> Under a Chapter XI arrangement, the debtor, as a juridical entity, ceases to operate the business. Control is transferred to a distinct legal entity, either a 'trustee' or a 'debtor-in-possession,' [citation], who will run the business under the supervision of the bankruptcy court.

*In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976) (citations omitted). It is the central purpose of rejuvenating financially desperate businesses which gives meaning to the administrative priority provisions of the Code:

> Congress recognized that, if a business is to be reorganized, third parties must be willing to provide the necessary goods and services. Since they clearly will not do so unless their claims for payment will be paid ahead of the prepetition debts and liabilities of the debtor, § [503(b)(1)(A)] provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankrupt estate.

*Id.*

Nonetheless, while Chapter 11 proceedings benefit, insofar as possible, the debtors, it is crucial to bear in mind the "overriding concern in the [Code] with keeping administrative expenses at a minimum so as to preserve as much of the estate as possible." *Otte v. United States,* 419 U.S.

43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974) (withholding-tax liability not afforded administrative priority).[12] *See also Randolph v. Scruggs,* 190 U.S. 533, 537–39, 23 S.Ct. 710, 712–13, 47 L.Ed. 1165 (1903) (Holmes, J.), where the Court held that a claim for professional services rendered to a bankrupt in preparing an assignment of assets would be afforded preferential treatment only to the extent the services benefitted the estate. *Accord, Matter of Lee,* 3 B.R. 15 (N.D.Ga.1979).

Hence, Bankruptcy Code provisions for allowing first priority to post-petition administrative expenses are based on the balance between two factors critical to Chapter 11 proceedings: maintaining the estate in as inviolate a form as possible for the benefit of the creditors while allowing essential costs of administering an ongoing business venture to be paid up front, thereby giving the debtor its best shot at emerging as a vital concern.

These principles were eloquently applied by the court here appealed from in *In re Hearth & Hinge, Inc.,* 28 B.R. 595 (Bankr. S.D.Ohio 1983). The debtor's landlord claimed administrative priority for prepetition rents. The court delineated arguments in favor of the allowance, *id.* at 596, but noted that the landlord's position

> must be weighed against the countervailing concerns of keeping administrative expenses to a minimum and narrowly construing the terms of the statute. [Citation.] It also must be noted that when Congress intended to allow an administrative priority for pre-petition expenses, it so stated in express terms. This is exemplified by § 503(b)(3)(E), which al-

---

**11.** Under the superceded Act, administrative priority was controlled by § 64(a)(1), former 11 U.S.C. § 104(a)(1) (1976). That statute is substantially similar to present 11 U.S.C. § 503(b)(1)(A), although the former statute provided priority for costs and expenses of administration *"including the* actual and necessary costs of preserving the estate." (Emphasis supplied.) Section 503(b)(1)(A) of the Code omits the underscored language, suggesting a more restrictive interpretation than under § 104(a)(1) of the Act.

**12.** *Otte* is a case which bears note in the present context. In *dicta,* the Court noted that "the very

language of § 64(a)(1) (*'including the* actual and necessary costs of preserving the estate . . .'*)* necessarily indicates that first priority items include some in addition to those that preserve or develop the bankrupt estate." 419 U.S. at 57, 95 S.Ct. at 256 (emphasis supplied). Because the very language which led to that observation was stricken from the revised statute, § 305(b)(1)(A), we suspect that the 1978 statute was intended to overcome the implications of *Otte* as to costs not specifically justified in terms of preservation of the estate.

lows an administrative expense for the actual, necessary expenses of a pre-petition custodian .... Congress's intent is also gleaned from the fact that § 503(b)(1)(A) was modeled upon § 64(a)(1) of the Act, which was consistently interpreted as precluding administrative expenses for pre-petition expenditures.

*Id.* at 597. The court therefore concluded that prepetition expenses were not entitled to § 503(b)(1)(A) priority.

A number of decisions demonstrate that the timing of an obligation, *i.e.,* whether the obligation to pay a debt arises pre- or post-petition, is crucial to a § 503(b)(1)(A) analysis. *In re Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984) is one of few decisions by Article III courts interpreting the statute. There, a Yellow Pages publisher sought administrative priority for its billings for Jartran's advertisements. The contract for the publications had been finalized prior to the Chapter 11 filing, but due to the peculiarities of the Yellow Pages industry, the ads were not run until long after the contract closing date. Many were thus published post-petition.

The court rejected the publisher's position. The sole basis for the result was the distinction between two separate entities: the debtor as it existed prepetition and the debtor as debtor-in-possession.

> [I]t was the pre-petition Jartran and not Jartran as debtor-in-possession that *induced* [the publisher] to perform these services [the post-petition publications]. To serve the policy of the [§ 301(b)(1)(A)] priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor.

**13.** The question of administrative priority for Yellow Pages debts pursuant to a pre-petition contract where performance by the publisher did not occur until after filing of the reorganization was raised, and resolved in identical fashion, in *In re Baths International,* 31 B.R. 143 (S.D.N.Y.1983). While the *Jartran* court criti-

*Id.* at 587 (emphasis in original; citation omitted).[13] *Accord, In re Boogaart of Florida, Inc.,* 23 B.R. 157, (Bankr.S.D.Fla. 1982) (overdraft amounts which were generated by checks written pre-petition but did not bounce until after the petition was filed are not entitled to administrative priority; the bank's claim was "against its depositor, Boogart-Florida as Debtor, and not against Boogaart-Florida as debtor-in-possession, a separate entity ....")

**D.** *Discretion of Bankruptcy Court*

 There is, then, substantial authority for the complementary propositions that administrative priority is not available where the debtor became bound to honor an obligation pre-petition, regardless of when the amount owed comes due; that the pre-petition debtor and the debtor-in-possession are distinct entities; and that priority statutes must be strictly construed. Notwithstanding this, appellees assert that bankruptcy courts enjoy significant discretion under the administrative priority provision, and that the discretion so enjoyed encompasses the authority to issue the orders appealed from. In *Hearth & Hinge,* 28 B.R. at 596, the court spoke of "the wide degree of discretion which the statute grants in awarding administrative priority expenses." Collier writes, in an arguably similar vein, that

> [a] court might well conclude that there are to be allowed as administrative expenses claims not necessarily precisely covered by the provisions of section 503(b) itself but which could fall into any of the phrases described in the subsections of section 503(b). Thus, what constitute actual and necessary costs and expenses of preserving an estate might well be open to judicial construction.

3 L.P. King, *et al.,* eds., *Collier on Bankruptcy* 503–13 (1984).[14]

cized the New York court's conclusion as to the characterization of the performance date, 732 F.2d at 587–88 n. 4, the policy considerations were resolved in the same manner.

**14.** We cannot, however, overlook the fact that the April, 1984 revisions to *Collier* contain language on this point somewhat dilute in compari-

We assume, without deciding, that the bankruptcy court has reasonable discretion in interpreting the provisions of § 503. It is clear that, whatever the boundaries of that discretion might be, it does not include the power to go beyond the clear intent and well-established construction of the provisions of the statute. Because a determination that a debt which matured pre-petition but did not come due until post-petition is, we think, wholly outside the statute, we see no basis for the assertion that the court enjoys the discretion to authorize such expenditures as administrative expenses. *See, e.g., Mammoth Mart*, 536 F.2d at 954 ("[f]or a claim ... to be entitled to first priority ... the debt *must* arise from a transaction with the debtor-in-possession"). (Emphasis supplied.)

E.

■ Having first established these general principles to guide construction of § 503(b)(1)(A), we now refocus on the precise questions before us in this portion of these appeals, first noting that the debtors appear to acknowledge that their contractual obligation to indemnify, as established by the corporate bylaws, is at best part of the compensation package they offer their directors.

Given that, the first issue is: Can a bankruptcy court lawfully authorize a debtor-in-possession to compensate, as an administrative expense, its directors whose rights to such compensation were fully matured, *i.e.*, whose obligations to the debtors were fully performed, when the petition for reorganizations was filed? The second issue is: Does the fact that the debt assertedly owed by virtue of the compensation package did not exist, other than as a general bylaws provision, until post-petition, make a difference?

We answer the first question in the negative. While the distinction between the pre- and post-petition entities appears at first to be a fiction, it is not so ethereal as that. Rather, the debtor-in-possession holds the position of trustee, and as such controls the estate *for the benefit of the creditors* instead of for its own benefit. While the debtor-in-possession has the power to choose, with the court's supervision, between acceptance or rejection of contracts which are executory when the reorganization petition is filed, *see* 11 U.S.C. § 365(a), the very essence of bankruptcy proceedings is equal treatment of similarly situated pre-petition creditors. As counsel for the Baldwin-United Committee put it at hearing,

> [t]he directors can no more vote to pay ... their former associates their fees than they can vote to pay one of the creditors his claim.

Tr. 6. *See also In re General Carpet Corporation*, 38 F.Supp. 200, 203 (E.D.Pa. 1941).

■ The second question just raised was whether the fact that the debt owed on the contract with the former directors did not turn into a reality, in terms of an amount of money, until after the petitions were filed, makes a difference. Again, we conclude that it does not. This distinction is not relevant to the *Stoller* defendants, as that case was filed pre-petition and so whatever obligations the bylaws place upon the debtors were called into play pre-petition. As to the former directors' representation in the other cases, however, we think that *Jartran*, 732 F.2d 584, *Mammoth Mart*, 536 F.2d 950, and, closer to home, *Hearth & Hinge*, 28 B.R. 595, make clear that the critical fact is that the claim did not arise from a transaction with the debtors-in-possession.[15]

---

son to the previous edition, cited by appellees, which asserted that "the phrase in section 503(b)(1) 'actual, necessary costs and expenses of preserving the estate' should not be thought to preclude a court from determining whether or not a certain claim offered as an expense of administration should not be within the meaning of such phrase," language omitted from the revisions. Thus, even the editors of *Collier* ap-

pears to take a somewhat narrower view of § 503(b)(1)(A) as cases construing the section emerge.

**15.** Although the matter has not been raised in this appeal, we have also considered whether or not the nature of an indemnification contract is such that completion of performance by one party does not render the obligation by the

We are, therefore, persuaded that the bankruptcy court lacked the discretion under § 503(b)(1)(A) to overlook the fact that, as to the former directors and officers, the obligation to indemnify fully matured prepetition in that the former officers' and directors' performance under their contracts with the debtors was complete at the time the petitions were filed.

Although not essential to the disposition of the question at bar, we briefly examine the merits of a determination, had one been made, that indemnification of the former officers and directors would qualify as "actual, necessary costs of preserving the estate" under § 503.[16] In *Hearth & Hinge,* the court noted its concern with "keeping administrative expenses to a minimum," 28 B.R. at 596; as noted by the *Jartran* court, "[a]ny preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress." 732 F.2d at 586 (citations omitted).

On the other hand, the only way in which appellees even suggest that paying the counsel fees for their former directors would "preserve the estate" is that the estate may ultimately be liable for any judgment entered against the individual defendants.[17]

It may be that the *Stoller, Quality Scale,* and *Van Treese* litigation will bear fruit for the plaintiffs therein before the reorganization is complete. However, even were judgments obtained, appellants argue persuasively that the judgment creditors would have a priority well below all existing creditors and would therefore pose no real threat to the integrity of the estate.[18] Thus it does not appear—although we acknowledge that, absent appropriate findings below, our conclusion on this point is speculative—that the estate would reap

---

other party finite. We have not researched the Bankruptcy Code's treatment of insurance contracts *per se,* and so we do not directly analogize to such contracts except to note that it is not at all uncommon for one party's obligations to remain unspecified, *i.e.,* contingent, after the other has fully performed; we think that had Congress intended such contracts to be treated differently from any other agreement, the Code would so provide.

**16.** We note in this regard the treatment of this point in *Jartran,* 732 F.2d at 587 (emphasis supplied):

> There is *no question* that the appearance of ads in Yellow Pages directories throughout the country is beneficial to Jartran, as a debt-or-in-possession, in the operation of its business .... Therefore, the only serious question on appeal is whether the district court incorrectly concluded that the claim did not arise from a transaction with the debtor-in-possession.

*Accord, Baths International,* 31 B.R. at 145. Thus, even were we to find that the potential benefits to the estates derived from prejudgment indemnification of the former directors were enormous—which we do not—we would not be in a position to affirm the orders of the bankruptcy court as to those individuals.

**17.** We note Professor Countryman's analysis of the prospect of a trustee's assumption of contracts fully performed by the non-debtor party:

> The trustee's option to assume or reject should not extend to such contracts. The estate has whatever benefit it can obtain from the other party's performance and the trustee's rejection would neither add to nor detract from the creditor's claim on the estate's liability. His assumption, on the other hand, would in no way benefit the estate and would only have the effect of converting the claim into a first priority expense of administration and thus of preferring it over all claims not assumed.

V. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 451–52 (1973).

**18.** In this regard, we note that Congress recently amended 11 U.S.C. § 510(b) (1984) to subordinate claims "for reimbursement or contribution allowed under section 502 on account of" claims "for damages arising from the purchase or sale of ... a security [of the debtor or of an affiliate]." Thus, it appears that Congress has specifically legislated to obviate the debtors' concern that the integrity of the estate in terms of present creditors will be compromised by large judgments in the securities fraud cases. Given that expression of Congressional purpose, we can hardly conclude either that Congress is unaware of the problem in which the debtors and their former directors find themselves, or that allowance of former directors' attorney's fees are within the bankruptcy judge's power to authorize administrative priority. Indeed, Congress seems to have legislated away appellee's strongest argument in support of their position that the estates will benefit from such expenditures.

sufficient benefits from 503(b)(1)(A) treatment of the former directors' litigation expenses to justify disregarding well-established principles applying to interpretation of the statute.

We therefore conclude that § 503(b)(1)(A) does not permit the debtors to advance attorney fees to their former officers and directors in order that they might defend themselves against allegations of misconduct during their tenure on the boards. We do not decide, since the question is not before us, whether, in the event that the preconditions to indemnification as set forth in the corporate bylaws are met, the former officers and directors would be entitled to administrative expense treatment after judgment. *See In re THC Financial Corporation*, 446 F.Supp. at 1332.[19] However, it seems even less likely that such payments would assist in "preserving the estate" after the individuals' liability has been determined one way or another than at the present time. While this unmistakably rings of "Catch 22," we can justify no other result within the framework of the Bankruptcy Code.

### F. *Equitable Concerns*

■ Finally, we consider whether or not purely equitable considerations would permit a deviation from established law to permit the debtors to fund their former directors' defenses, for a bankruptcy court is traditionally a court of equity. *See In the Matter of Gray*, 7 CBC 571, 584 (Bankr.Me.1975) (Cyr, J.). We do not doubt that the former directors will find themselves under significant hardship by being required to fund their own defense in the securities and other litigation. While it is true that they will be able to obtain, under any reorganization plan, the same propor-

tion of their losses as any other unsecured creditor,

[t]he basic problem here is that the officers and directors have served in reliance on indemnification, and to have them now personally held liable for costs and judgments against them for acts done in their corporate capacities, and giving them only dubious general unsecured claims against their now-bankrupt employer corporations appears 'unfair.'

*In re THC Financial Corporation*, 446 F.Supp. at 1332. Carrying its development of the problem a step further, the *THC* court noted that

[o]fficers and directors ... act *on behalf* of the corporation, whereas other 'creditors' or claimants deal *with* the corporation at arms' length. Although the officer or director receives a salary for his service, he receives no particular benefit from any particular transaction he enters into for his employer. Per contra, others enter into transactions with the corporation for their own benefit. Thus, officers and directors can be seen as *sui generis* in their role as claimants.

*Id.* (emphasis in original).

The distinction between business creditors and directors as creditors is superficially appealing, although we are not wholly persuaded that those serving on the boards of corporations as prominent as were these debtors receive no benefit from their service.

Nonetheless, while the former officers' and directors' argument as to their being *sui generis* is different from the claims of the Yellow Pages publisher in *Jartran*, 732 F.2d at 590–91, that their claim was *sui generis*, we think the result must be the same. Comparison of § 503(b)(1)(A) with

---

**19.** The *THC* case is, to our knowledge, the only case dealing with the issues here raised in the context of the Bankruptcy Act. While the implications of the case have been considered at length in our deliberations, we have not included discussion of it herein because we conclude that appellants are correct in asserting that the court's conclusion in *THC* that indemnification as administrative expense might be appropriate in certain cases (other than the one before it)

was expressly based upon language in section 216(3) of the Bankruptcy Act, former 11 U.S.C. § 616(3), permitting administrative treatment for "other allowances which may be approved or made by the judge." 446 F.Supp. at 1332. Because we conclude that the Bankruptcy Code has no parallel provision, the *THC* case is of limited utility in analyzing the issues now before this Court.

§ 64(a)(1) of the Bankruptcy Act, former 11 U.S.C. § 104(a)(1), leads us to conclude that in deleting the language from the superceded statute which was construed in *Otte*, 419 U.S. at 57, 95 S.Ct. at 256, to include expenses not dedicated to the betterment of the estate, Congress intended to reduce the amount of discretion enjoyed by bankruptcy courts in granting administrative priority, and therefore the extent to which bankruptcy courts enjoy equitable powers *vis a vis* administrative priority. It is also beyond travail that the most significant policy in bankruptcy jurisprudence is equality of treatment of like-situated creditors.

It must also be noted in the context of the equities here that the actions against the directors assert that they breached their duty of care with respect to the debtors. While the directors and debtors are likely persuaded that the lawsuits are meritless, "[i]t would be simply intolerable for a bankrupt corporation's estate to be responsible for preadjudication defense costs when it may be possible that allegations of misconduct are in fact true." *In re THC Financial Corporation,* 446 F.Supp. at 1332.

Thus, an effort to invoke equitable considerations to permit advance indemnification of these individuals' legal expenses "would be contrary to the reason the [administrative] priority was created: as a practical incentive to achieving reorganization for the benefit of all creditors." *Jartran,* 732 F.2d at 590. We do not believe that any court has the "discretion" to overlook or defeat clear statements of Congressional purpose, and so we conclude equitable factors may not defeat the well-established principles of administrative prioritization delineated above.

### G. *SEC Proposal*

The result we reach is in accord with that urged by the Securities and Exchange Commission. Realizing, as do we, that such a result bodes poorly for the former directors, the SEC suggests that the Court permit the debtors to advance funds to the former officers and directors for their defense conditioned upon posting of collateral sufficient to fully secure the loans, together with interest. There are other components to the SEC's proposal, primarily assurances of performance by the recipients of such loans. We do not detail these, because we are unable to agree with the SEC that such a scheme would be worthwhile as applied to the former officers and directors. Our concern is that the proposal would benefit only those former officers and directors who have sufficient resources to secure such a loan in the marketplace; the creditors would be entitled to no less. We are also loath to burden the bankruptcy court with any more administrative tasks than the enormous proceedings before it absolutely require. Finally, we think it ill-advised to place the debtors-in-possession in the position of foreseeably being obligated to foreclose upon property held by their former officers and directors in the event indemnification is not found to be appropriate.

We are acutely aware that our conclusion today as to the unavailability of funds from the estates for the defense of these former officers and directors has potentially disastrous implications for those individuals, and we do not discourage appeal herefrom. We have given careful consideration to arguments that the fact that the directors were providing essentially gratuitous services and that public policy prefers that large corporations secure the service of nonmanagement directors somehow justifies deviation from the body of law requiring narrow construction of prioritization statutes, arguments which apparently carried the day in the bankruptcy court. However, while these assertions have limited appeal, we do not find them compelling.

### H.

We do note that this entire controversy might well have been avoided had the debtors obtained officers' and directors' liability insurance, which is not only readily available to liquid corporations but which, we understand, was one of the businesses of debtors' own subsidiaries. Our decision today makes painfully apparent the importance of such insurance. At argument,

counsel justified the debtors' failure in this regard as being a "business decision;" be that as it may, it is surely a decision with potentially disastrous implications. While we do not fault the former officers and directors for debtors' failure in this regard, we cannot help but conclude that where a loss could have been avoided by relatively simple means, those asserting that a consequent loss should fall upon large numbers of individual creditors, albeit proportionally, have an uphill battle.

We now turn our attention to the question of whether the debtors may advance funds for the defense of present directors.

## IV. *The Present Directors*

Article 6.5 of both debtors' bylaws provides:

> Expenses, including attorneys' fees, incurred in defending any action, suit, or proceeding referred to in [prior sections of the bylaws] may be paid by the Company in advance of the final disposition of such action, suit, or proceeding as authorized by the directors in the specific case upon receipt of an undertaking by or on behalf of the director, trustee, officer, employee, or agent to repay such amount unless it shall, (sic) ultimately be determined that he is entitled to be indemnified by the Company as authorized in this Article.

Bylaws of D.H. Baldwin Company, Appendix D to Brief of Appellees: *see also* Bylaws of Baldwin-United Corporation, Appendix C to Brief of Appellees. The debtors renew, in this Court, their assertion below that this language creates a contract between them and their directors which obliges them to advance litigation fees and which is subject to assumption pursuant to section 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a). That statute provides that "... the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." As was true in the case of the authorization to advance the former directors' fees, we have no basis from which to conclude whether or not this theory was accepted by the bankruptcy

court, but we so assume for present purposes.

As developed in the pages which follow, we conclude first that there was no executory contract subject to assumption. Second, we determine that even were there such a contract, debtors' failure to bear the directors' prejudgment litigation costs, including attorney's fees, would not constitute a material breach of their asserted agreement with their directors. We therefore reverse the orders appealed from as they pertain to the present directors, and remand to the bankruptcy court for consideration of this issue under the standard set forth in section 503(b)(1)(A) of the Code, 11 U.S.C. § 503(b)(1)(A).

## A. *Executory Contracts in Bankruptcy*

The question of what contracts are executory as that term is used for bankruptcy purposes is itself not firmly established, although it is clear that Williston's suggestion that "all contracts to a greater or less extent are executory," 1 S. Williston, *Contracts* § 14 (3d ed. 1957) is not controlling in the bankruptcy arena. Rather, we accept for present purposes Professor Countryman's definition as noted in *Collier:*

> A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

V. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973), *cited in* 2 L. King, *et al.,* eds., *Collier on Bankruptcy* ¶ 365.02 n. 3 (15th ed. 1984). This definition, encompassing as it does the principle of mutuality, appears consistent with the understanding of both chambers of Congress in enacting § 365. *See* H.R. 595, 95th Cong., 2d Sess. 347, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5963, 6303; S.R. 989, 95th Cong., 2d Sess. 58, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5844; *but see In re Jolly,* 574 F.2d 349, 350–51 (6th Cir.), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58

L.Ed.2d 322 (1978), noting that "[s]uch definitions [as Countryman's] are helpful, but do not resolve" questions of whether a particular contract is executory.[20]

**B.**

■ We now examine the debtors' assertions as to the nature of their agreement with their directors. We have found no authority for the proposition that "[c]orporate bylaws ... constitute a contract between the corporation and its directors and officers." Brief for Appellees at 12. Their citation to *Elisian Guild, Inc. v. United States,* 412 F.2d 121, 124 (1st Cir.1969) is unpersuasive, as that case simply observes that corporate bylaws are "in effect a contract between the corporation and its *members*" (emphasis supplied). Similarly, *Stevenot v. Norberg,* 210 F.2d 615 (9th Cir. 1954) simply held that bylaws constitute a contract between *shareholders* and the corporation. (While most, if not all, of these directors are in fact shareholders, appellees do not premise their argument on that fortuity.) Thus, we think the relationship between a corporation and its directors *vis a vis* the corporation's bylaws is appropriately described by the SEC as follows:

> While by-laws of a corporation constitute a contract between the corporation and its shareholders—not between the corporation and its officers and directors—directors may enforce, as third-party beneficiaries, obligations of the company incorporated in the by-laws.

**20.** In fact, our review of the cases lends considerable support to Judge Peck's observation in *Jolly,* 574 F.2d at 350, that the phrase "'executory contracts' is meaningless; once a contract ceases being executory ... it ceases to exist. " We are, nonetheless, faced with an enactment providing for specified treatment of such obligations, and therefore work within Professor Countryman's framework.

**21.** In fact, the SEC's analysis of the relationship between directors and their corporations appears more suited to non-bankruptcy situations, for it is more an intellectual construct than a framework suitable for determination of the rights of directors in a large public corporation under the corporation's bylaws. For example, while we have not explored the vagaries of third-party beneficiary contract law as it might

Brief of the Securities and Exchange Commission at 12 n. 13 (citations omitted).[21]

**C.**

The situation here, then, construed most favorably to the appellees, is that they seek to assume contractual obligations they perceive as existing between them and a nonparty beneficiary to their bylaws. Any doubt we might have as to whether or not such a formulation is legally possible under the Bankruptcy Code, which makes no mention of third-party beneficiaries, need not be resolved, because we conclude that even assuming such a possibility, there were no contracts susceptible of assumption upon the date the Chapter 11 petitions were filed.

This conclusion rests upon two determinations. The first is that, as noted, the somewhat restrictive definition of executory contracts in the bankruptcy context requires mutuality of obligation in order for a contract to be executory. The second is that, applying this definition to the relationship between the debtors and their directors, there is no such mutuality, and therefore no executory contract.

■ Our review of the record and the appendices to the various briefs herein has revealed no obligations running from the directors to the corporations on whose boards they serve. They are, of course, fiduciaries and as such are bound to act in the best interest of the corporation, in good faith, and the like.[22] However, it appears

pertain to this case, we have the impression that such analysis would require the Court to examine the duties running from shareholders to the debtors in order to determine the rights of the directors under any such contract; similarly, since the "contract" embodied in the bylaws is probably a unilateral one (because the shareholders' obligation thereunder was fulfilled by the sole act of purchasing shares), we have difficulty envisioning how such a contract could be executory insofar as bankruptcy executory contract theory requires mutuality of obligation.

**22.** It is, however, noteworthy that "[t]he rule prevailing in most jurisdictions ... is that when the corporation becomes insolvent, the directors are thereafter considered as trustees for the corporate creditors." 3 *Fletcher Cyclopedia Corporations* § 849 (1945 ed.). It appears, then,

that the directors' only duties are to ·discharge whatever they do on behalf of the corporations in accordance with their role as fiduciaries. As noted by the SEC,

> [u]nder the debtors' by-laws, directors serve for three-year terms but are free to resign at any time. [fn. 14/*See* Baldwin-United Corporation By-Laws Article 3.1 (A. 172).] And, after resignation, the directors have no continuing obligations to the debtors. The mere fact that the debtors continue to serve does not thus represent the type of mutuality contemplated by the bankruptcy laws since the debtors cannot, by advancing legal fees ... compel continued service by these directors.

Brief of the Securities and Exchange Commission at 12–13 and n. 14.

■ The debtors' position that they are responsible for the prejudgment litigation expenses of their former directors demonstrates that they do not view their obligation to grant such indemnification for attorney fees as being contingent upon continued service by the directors. That is, there is nothing that the directors could do which would constitute a breach of contract such that Baldwin would be excused from performing the analysis called for in the by-laws to determine whether an individual covered by the indemnification provisions is entitled to indemnification.

Similarly, because the debtors have no basis for arguing that the directors are contractually bound to continue to serve as directors, there is nothing that the debtors could do which would excuse the directors' performance of contractual obligations— because in fact there are no such obligations.

We therefore conclude, as noted above, that there was, at the time the petitions were filed, no contract between the directors and the pre-petition debtors which is susceptible to assumption as an executory contract by the debtors-in-possession. Debtors' arguments that the situation at bar is no different from any other employment contract situation fails precisely because there is no mutuality of obligation, as is the case where an employee is contractually bound for a period of time unless the employer breaches the contract.

D.

■ There is . an additional problem, however, which would itself be grounds for reversal of the orders appealed from. Even were we to find that there was an executory contract between the pre-petition debtors and their directors which the debtors-in-possession could then seek to assume, any such contract would not include, as one of the debtors-in-possession's *obligations* thereunder, prejudgment indemnification for directors' attorney fees. We so conclude because the relevant portion of the bylaws is worded in obviously permissive terms: "Expenses, including attorneys' fees, ... *may* be paid by the Company in advance of the final disposition of such action ...." Bylaws of D.H. Baldwin Company, Appendix D to Brief of Appellees (emphasis supplied). Because there is no obligation on the part of the debtors, even were they unfettered by the terms of the Bankruptcy Code, to advance fees, there is no merit to debtors' assertion that

> [i]t is beyond dispute that if the debtors in possession were to refuse to indemnify a present officer or director against his or her defense costs, that would constitute a material breach of the employment contract and excuse the officer or director from continuing his performance.

Brief for Appellees at 13. Simply that the corporations "may" absorb such costs while litigation against the directors pends means neither that it must do so, nor that it would be a breach of contract for it to fail to do so. It therefore follows that even were the directors contractually bound to render any additional performance, failure

---

that the directors of a Chapter 11 debtor are not fiduciaries of the corporation; rather, they are fiduciaries of the estate, which the debtor in possession holds as trustee for the creditors, 11 U.S.C. § 1107(a). Given that, it is difficult to accept debtors' position that, in effect, there is no difference in the relationship between the debtors and their directors pre- and post-petition, since the nature of the directors' duties has changed from helmsman to guardian.

to foot their prejudgment defense bills would not excuse such performance.

This result is wholly supported by *In the Matter of Central Watch Inc.*, 22 B.R. 561, 569 (Bankr.S.D.Wisc.1982), a case cited by appellees. There, a former officer of the debtor entered into an express contract containing both restrictive covenants in the form of a noncompetition agreement and a "hold harmless" or indemnification provision similar to those at issue in this case. The former officer had been sued on a guarantee of a note incurred by the debtor, and the debtor did not indemnify him. He argued that the contract was materially breached and he was not bound by the restrictive covenant. Rejecting that assertion, the court concluded that because there were preconditions to indemnification, the mere fact of failure to indemnify was insufficient to constitute a breach of the employment contract, and therefore that the restrictive covenant was enforceable.

In other words, even were the bylaw provisions found to constitute an executory contract in bankruptcy parlance, the failure of the debtors following assumption of that contract to pay their directors' attorney fees would not constitute a breach of contract. Once the case against the director has concluded favorably to the director or, despite an unfavorable result, the director is found to have acted within the terms set forth in the relevant bylaw provisions, then the debtors' obligation to indemnify appears to be uncategorical; failure to indemnify at that point would arguably be a breach of contract. However, the same cannot be said of the failure to take steps which are not, by their terms, mandatory.

We therefore conclude that, if the bankruptcy court found that the debtors were obliged or able to advance litigation fees to present directors based upon executory contract provisions in the Code, it erred as

a matter of law. The orders appealed from are reversed insofar as they permit the debtors to advance legal fees to their present directors for defense of non-bankruptcy litigation.

### E. *S.E.C. Proposal*

██ The S.E.C. has also offered a proposal to alleviate the impact of our conclusion today on the present directors, and we think that their suggestion in this regard is better-reasoned than the proposal for permitting the debtors to make secured loans to the former directors.

Basically, the Commission proposes that the debtors might be entitled to have the expenses of defending their present directors given priority treatment as administrative expense pursuant to section 503(b)(1)(A). Its brief refers to the test for administrative expense eligibility set out in *Mammoth Mart*, 536 F.2d at 954:

> For a claim in its entirety to be entitled to first priority ... the debt must arise from a transaction with the debtor-in-possession. When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

We see no good reason not to adopt the Commission's suggestion in this regard. The debtors have argued in this appeal, and the outside directors have argued to this Court in their filings in *Stoller*, that their continued service is crucial to the debtors' chances for a successful reorganization, and we are willing to permit them to put that assertion to the test set forth in *Mammoth Mart*.[23] However, the record is

---

**23.** Part of our rationale in temporarily staying the *Stoller* action as against the non-debtor defendants therein was that the directors should be able to direct their full attention to the reorganization effort, at least for the time being. *Stoller v. Baldwin-United Corporation*, 41 B.R. 884, at 892 (S.D.Ohio, 1984). At argument,

counsel for the debtors suggested that we take judicial notice of that point as sufficient to satisfy the Court that the directors are indeed playing an irreplaceable role in the reorganization. However, we do not think that the papers in *Stoller* demonstrate the importance of the di-

wholly inadequate to permit us to determine whether or not their services are sufficient to justify administrative treatment for their litigation costs, and so we remand to the bankruptcy court so that it may hear such evidence as it deems necessary and apply its substantial expertise to the question.[24]

In conducting its inquiry we are confident that the bankruptcy court will focus, as § 503 commands, upon the benefits the debtors can demonstrate that they will obtain from the outside directors' continued service, as opposed to the potential detriment the directors will experience should their defense costs not be given administrative treatment. As noted in *Mammoth Mart,*

> even when there has technically been performance by the contract creditor during the reorganization period, he will not be entitled to [administrative] priority if the bankrupt estate was not benefitted therefrom.

*Id.,* 536 F.Supp. at 954 (citations omitted); *see also Randolph v. Scruggs,* 190 U.S. at 537–39, 23 S.Ct. at 712–13. While we understand that the task we set out for the bankruptcy court will add to its difficulties in managing this all but unmanageable litigation, we think that the terms of the

statute require that each director's activities be examined individually; only if the estate has or will benefit from the individual's services should administrative priority lie.[25] Similarly, where a director's willingness to serve is not expressly conditioned upon payment of his or her legal fees—perhaps an unlikely prospect—then payment of their fees will not preserve the estate, and so should not be administratively treated.

We also request that the Securities and Exchange Commission clarify for the bankruptcy court its apparent position that indemnification of directors for liabilities alleged to lie under the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.,* is against public policy as asserted in the Baldwin-United Committee's brief at 16–17. We express no opinion at this time as to whether or not it would be appropriate to grant administrative priority to expenses which may run counter to the Commission's position on indemnification under the Securities Act, but we would appreciate the bankruptcy court's considering the issue in its deliberations and expressing its views on the matter.

We do not presume to have enumerated all of the factors the bankruptcy court will see fit to take into consideration in reach-

---

rectors' activities sufficiently to base thereon the expenditure of significant sums from the estate.

**24.** We have considered whether or not it would be appropriate for such a hearing to be held in this Court, and have concluded that uncertainty presently attending all things relating to bankruptcy law indicate that the prudent course is to seek the bankruptcy court's assistance in the first instance. *Compare In re Morrissey,* 717 F.2d 100, 104 (3d Cir.1983) (Aldisert, J.) (district court sits as court of appeals in bankruptcy and has no *de novo* jurisdiction) *with In re 1616 Reminc Limited Partnership,* 704 F.2d 1313, 1316–18 (4th Cir.1983) (district court must conduct *de novo* review of bankruptcy court rulings). If required to adopt either of these approaches, we would likely opt for (now Chief) Judge Aldisert's analysis, as he is the Chairman of the Judicial Conference Advisory Committee on Bankruptcy Rules; however, we prefer to avoid this aspect of the fray unless and until faced with determining the appropriate standard of review of the bankruptcy court's findings and conclusions on remand.

**25.** To further complicate the bankruptcy court's task upon remand, we think consideration must be given to whether or not the services being rendered to the estates which might otherwise arguably justify administrative expense treatment for their legal fees are services covered by Code § 327(a), 11 U.S.C. § 327(a), governing persons eligible for compensation for professional services rendered to the estate. This concern is generated by *In the Matter of Schatz Federal Bearings Co.,* 17 B.R. 780 (Bankr.S.D. N.Y.1982). There, faced with applications for administrative expense treatment for post-petition services rendered by the debtors' directors for such things as "'participating in an ongoing critical analysis of the Debtor's ability to continue to operate,'" *id.* at 782, were found to be outside the scope of the directors' duties and therefore not only ineligible for § 503(b)(1)(A) treatment, but also ineligible as professional services.

ing its conclusion. We do, however, retain jurisdiction to review the determinations made upon remand absent independent appeals from the bankruptcy court's orders.

### V. *Conclusion*

The orders appealed from are reversed. This judgment shall be final as to the former directors of the debtors, and we expressly determine that as to that aspect of the bankruptcy court's orders, there is no just reason for delay; the Clerk of this Court is asked to enter judgment in favor of appellants as to that aspect of these appeals. The issue as to the present directors is remanded to the bankruptcy court for whatever proceedings it deems necessary to analyze debtors' assertions under 11 U.S.C. § 503(b)(1)(A), and we retain jurisdiction to review those findings without requiring filing of further appeals to this Court.

SO ORDERED.